UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

TROY K. SHEFFLER                                                    PLAINTIFF


v.                                              CIVIL ACTION NO. 3:14-CV-373-CRS


ALEX LEE, et al.                                                   DEFENDANTS

## MEMORANDUM OPINION

This matter is before the court on motion of defendant Louisville/Jefferson County Metro

Government ("Metro") for judgment on the pleadings as to the claims against it, pursuant to

Fed.R.Civ.P. 12(c).

1. Legal Standard

In considering a Rule 12(c) motion for judgment on the pleadings, "all well-pleaded

material allegations of the pleadings of the opposing party must be taken as true, and the

motion may be granted only if the moving party is nevertheless clearly entitled to judgment."

*Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th

Cir. 1973). Although the court's decision rests primarily upon the allegations of the

complaint, "matters of public record, orders, items appearing in the record of the case, and

exhibits attached to the complaint may also be taken into account. *Amin v. Oberlin College*,

259 F.3d 493, 502 (6th Cir. 2001), *quoting Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir.

1997). But the court "need not accept as true legal conclusions or unwarranted factual

inferences." *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). To withstand a motion for

judgment on the pleadings herein, a sufficient claim will "contain direct or inferential

allegations respecting all the material elements under some viable legal theory." *Commercial Money Center, Inc. v. Illinois Union Insurance Company*, 508 F.3d 327 (6th Cir. 2007).

2.  Factual Allegations

This action arose from an incident which occurred on May 17, 2013 initially in the lobby of the Galt House Hotel in Louisville. The encounter continued on the street outside the hotel, and ultimately resulted in the transportation of the plaintiff, Troy K. Sheffler, by ambulance for evaluation and possible treatment at a local hospital.

Sheffler's First Amended Complaint (DN 35) alleges, in part, the following facts:

Sheffler, a resident of Coon Rapids, Minnesota, was staying at the Galt House Hotel on May 17, 2013. On that evening, after patronizing 4th Street Live! venues with a friend, Sheffler headed to the Galt House intending to return to his hotel room. At approximately 1:00 a.m., Sheffler entered the lobby and asked for directions to room 1005. He was told by security officer Jordan Keister that the room was in the tower across the street. Keister followed Sheffler as he headed toward his room. As this disturbed Sheffler, he stated to Keister that he wanted to speak to Keister's supervisor about being followed and whether this was hotel policy. The two men returned to the front desk lobby at approximately 1:06 a.m. and Sheffler waited while Keister contacted a supervisor.

Louisville Metro Police Officer Alex Lee was in the vicinity of Sheffler near the concierge desk. He inquired why Sheffler had returned to the lobby and asked to see Sheffler's identification. Lee refused to produce his identification and stated that his complaint was

between himself and the hotel staff.  Lee stated that if Sheffler refused to produce his identification he would take him to jail.

At approximately 1:08 a.m. hotel supervisor Tim Howard arrived and spoke with Sheffler.  Lee interrupted the conversation between Howard and Sheffler and again stated that if Sheffler did not cooperate and produce identification he would be arrested.

At approximately 1:12 a.m. Sheffler asked Lee if he was being detained, and Lee affirmed that he was not free to leave.  Sheffler then called 911 from his cell phone and requested that someone be sent to mediate the situation, as he was being illegally detained by a Louisville Police Officer.  Sheffler read Lee's badge number to the dispatcher.  Although Sheffler requested that a supervisor be sent so that he could file a complaint against Lee, Lee spoke over his radio to a supervisor and canceled the call.

Sheffler then proceeded out the front door of the hotel where he was surrounded by Lee and other hotel security officers.  He was informed that he was still on private property to which Sheffler responded that he would walk a little further down the sidewalk.  Lee again asked Sheffler to produce identification and told him he would be arrested on a charge of Alcohol Intoxication if he did not cooperate.  Lee then assaulted him, threw him against a car, and handcuffed him.  Sheffler was then placed in the back of a squad car and deprived of his wallet and anxiety medication.

Sheffler informed Lee that he suffered from panic disorder and that he needed to have his medication returned to him.  Lee refused.  Lee turned on the surveillance camera in the squad car and gave a false narrative of the incident to which Sheffler objected.  At 1:27 a.m. Sheffler suffered a panic attack and asked to be taken to the hospital.  Lee responded that he would be

3

going to the hospital, and at 1:29 a.m. informed dispatch that Sheffler was complaining of a panic and/or heart attack.

At 1:35 a.m. Emergency Medical Service ambulance arrived.  Sheffler complained that his arms were going numb, he was having a panic attack, and felt that he might be having a heart attack.  Paramedic Michael A. Carroll stated that Sheffler was hyperventilating and needed to slow down his breathing.  Lee told Carroll that Sheffler had previously been belligerent and combative.  Carroll told Lee that Sheffler was not having a panic attack.  Paramedic Stephanie M. Albertson then asked Sheffler for identification and told him that the hospital would not treat him unless he cooperated and provided information concerning his identity.  Sheffler continued to refuse to provide the information.  He was allowed out of the squad car at 1:44 a.m.  Sheffler was transported to the hospital by ambulance and was admitted to the emergency room at 2:05 a.m.

Lee demanded that Sheffler provide a urine sample.  Sheffler refused.  Lee told Sheffler that he would be catheterized to obtain the sample if he did not give them one.  Sheffler continued to refuse.  At 2:15 a.m. Sheffler was placed on a security hold, and at approximately 3:00 a.m.  Sheffler was released from the security hold and discharged by the emergency room physician, Dr. Raymond Orthober.  At 3:22 a.m. Sheffler signed "under protest" the discharge instructions indicating that he had been evaluated for "Acute Alcohol Intoxication."  At 3:30 a.m. Sheffler urinated in his pants, was given clean socks, and was transported to jail by Lee under charges of Disorderly Conduct and Alcohol Intoxication.  Sheffler was released from jail on the evening if May 18, 2013.  Sheffler was denied his anxiety medication from the point of his arrest until his release from jail, despite Sheffler's repeated demands for it.

Sheffler was prosecuted and was ultimately acquitted of the charges.

Sheffler filed suit against:

(1)   Lee, indicating that he is employed by the City of Louisville, Kentucky, as a Louisville Metro Police Officer and is employed by Frederick Asset Protection LLC.   The Amended Complaint states that "Lee is sued in his individual capacity for actions under color of law as a Louisville/Jefferson County Metro Police Officer."  (DN 35, ¶ 8).

(2)   Carroll, indicating that he is employed by the City of Louisville as a Louisville/Jefferson County EMT.  The Amended Complaint states that "Carroll is sued in his individual capacity for actions under color of law as a Louisville/ Jefferson County EMT."  (DN 35, ¶ 13).

(3)   Frederick Asset Protection, Louisville, Kentucky.  The Amended Complaint states that   "Frederick Asset Protection shall answer to claims made in [sic] the acts [sic] their employee and Defendant Alex Lee per *respondeat superior*."  (DN 35, ¶ 11).

(4)   Louisville/Jefferson County Metro Government.  The Amended Complaint states that "Louisville Metro shall answer to claims made in [sic] the acts [sic] their employees and Defendants Alex Lee and Michael Carroll per *respondeat superior*.  (DN 35, ¶ 16).   The Amended Complaint further alleges that "Louisville Metro is amenable to suit under § 504 of the Rehabilitation Act of 1973  ("RA"), Title II of the Americans with Disabilities Act, as amended ("ADA"), and the supporting regulations, in accordance with U.S. Const amend. XIV § 5, in abrogation of any sovereign immunity or immunity derived through U.S. Const. amend. XI." (DN 35, ¶ 17).

3. <u>Legal Analysis</u>

The essential premise of Sheffler's case is that Lee and Carroll violated his constitutional rights by assaulting him, detaining him, arresting him, and prosecuting him on trumped-up charges. Sheffler claims that he was within his rights to refuse to provide personal identification, and that the wrongful treatment he received was in retaliation for his refusal to cooperate with Lee's demands that Sheffler identify himself.

Sheffler asserts nine claims in his Amended Complaint:

(1)  Common law battery against Lee, Carroll, and Metro.

(2)  Common law false imprisonment against Lee and Metro.

(3)  Common law malicious prosecution against Lee and Metro.

(4)  Violation of 42 U.S.C. § 1983 for infringement of I and XIV Amendment rights against Lee.

(5)  Violation of 42 U.S.C. § 1983 for infringement of IV and XIV Amendment rights against Lee.

(6)  Violation of 42 U.S.C. § 1983 for infringement of XIV Amendment rights against Lee and Carroll.

(7)  Violation of Title II of the American with Disabilities Act ("ADA") against Metro.

(8)  Violation of § 504 of the Rehabilitation Act of 1973 ("RA") against Metro.

(9)  "*Monell* Claim" against Metro.

The sole motion presently before the court is Metro's motion for judgment on the pleadings. Sheffler concedes that the common law claims must be dismissed as to Metro. Counts I, II, and III will be dismissed as against Metro.

6

Sheffler has alleged violations of his constitutional rights by Lee and Carroll, and seeks damages from Metro therefore under a so-called "*Monell* claim," asserting that *Monell v. New York Dep't of Social Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) authorizes the imposition of liability against a local government entity for § 1983 violations where the entity's official policy or custom actually serves to deprive an individual of his constitutional rights.  As noted in *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006),

> A city's custom or policy can be unconstitutional in two ways:  1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers.

*Gregory*, *supra., citing Monell*, 436 U.S. at 692-94.

The Amended Complaint alleges nothing more than the conclusory phrases "systematic failure to train" and "systematic failure to conduct meaningful investigations."  The court explained in *Weathers v. Anderson*, No. 3:11CV-683-H, 2012 WL 1593136, *3 (W.D.Ky. May 4, 2012) why such bare conclusions are insufficient to survive a motion for judgment on the pleadings:

> Plaintiff merely states in his complaint that "[f]ailure to properly train officials led to these deprivations against the Constitution of the United States."  This is insufficient to impose liability on the city.  *See Stanley v. Landers*, No. 09-cv-52-PB, 2009 WL 3757389, at *1 (D.N.H. Nov. 9, 2009)(finding conclusory assertion that guard was not adequately trained insufficient to survive a motion to dismiss after *Iqbal*).  Plaintiff does not attribute this failure to train to any individual or entity.  He fails to provide any facts regarding the alleged training that was omitted or how the lack of training led to his injury.  Moreover, Plaintiff has failed to allege any prior allegedly unconstitutional conduct which would have placed the city on notice that its training was inadequate, *Connick*, 131 S.Ct. at 1360 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights"), or to allege that his injury was a "'patently obvious' consequence of the deficiency in the training program." *Siler v. Webber*, 443 F.App'x 50, 55 (6th Cir. 2011)(quoting *Connick*, 131 S.Ct. at 1361).

A sufficient claim must "contain direct or inferential allegations respecting all the material elements under some viable legal theory," *Commercial Money Center, Inc. v. Illinois Union Insurance Company*, 508 F.3d 327 (6th Cir. 2007), The *"Monell* claim" (Count IX) herein does not.  It contains nothing more than conclusory statements of failure to train and failure to investigate.  The court "need not accept as true legal conclusions or unwarranted factual inferences," *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999),  Count IX will therefore be dismissed.

Metro also seeks judgment on the pleadings on the ADA and RA claims (Counts VIII and IX).  These claims are asserted only against Metro for the purported acts of Lee and Carroll.  For the reasons stated below, Sheffler fails to state a claim against Metro for violations of the ADA or RA.

There is a narrow body of federal law which has developed in the context of arrests of individuals with disabilities.  It has been noted as recently as June, 2015 that "[W]hether Title II applies to arrests is an open question in [the Sixth] Circuit…" *Jones v. Lacey*, 108 F.Supp.3d 573, n. 1 (E.D.Mich. 2015), *quoting Everson v. Leis*, 412 Fed.Appx. 771, 774 (6th Cir. 2011).  We assume for purposes of this analysis, however, that Title II ADA claims and an RA claims arising in the context of an arrest are viable in this circuit.

To withstand a motion for judgment on the pleadings herein, a sufficient claim will "contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Commercial Money Center, Inc. v. Illinois Union Insurance Company*, 508 F.3d 327 (6th Cir. 2007).

As explained in *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998),

The ADA consists of three titles addressing discrimination against the disabled in different contexts.  Title I prohibits employment discrimination, 42 U.S.C. §

12112, Title II prohibits discrimination in the services of public entities, 42 U.S.C. § 12132, and Title III prohibits discrimination by public accommodations involved in interstate commerce such as hotels, restaurants, and privately operated transportation services, 42 U.S.C. §§ 12182, 12184.  Title II took effect in January of 1992 and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132…The ADA has no federal funding requirement, but it is otherwise similar in substance to the Rehabilitation Act, and "cases interpreting either are applicable and interchangeable." [citation omitted].

*Gorman,* 152 F.3d at 911-12.[1]

To establish a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) [ ]he has a disability; (2) [ ]he is otherwise qualified; and (3) [ ]he was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of [his] disability.

*Anderson v. City of Blue Ash*, 798 F.3d 338, 357, n. 1 (6th Cir. 2015)(citing *Tucker v. Tennessee*, 539 Fed.3d 526 (6th Cir. 2008) and *Dillery v. City of Sandusky*, 398 F.3d 562 (6th Cir. 2005), but eliminating the requirement that discrimination be "solely" because of plaintiff's disability, finding that in Title II claims, discrimination must be shown to have been "because of" the individual's disability).  A *prima facie* case requires a plaintiff to show that the "discrimination was *intentionally* directed toward him or her in particular."  *Tucker*, 539 F.3d at 532 (emphasis in original).

In arrest cases, there are two theories under which a plaintiff can establish an ADA claim: (1) where the police wrongfully arrest an individual with a disability because they misperceive the effects of that disability as criminal activity, and (2) where police fail reasonably to accommodate an individual's disability during an investigation or arrest, causing that individual

---

[1] Sheffler has alleged and Metro has admitted that Metro receives federal funds for its operations.  Therefore, our analysis will encompass the virtually identical claims asserted under the RA.

to suffer greater injury than otherwise would occur.  *Montae v. American Airlines, Inc.*, 757 F.Supp.2d 47 (D.Mass. 2010).

By way of illustration, the plaintiff in that case, Mariyah Montae, presumably suffered from Post-Traumatic Stress Disorder ("PTSD") which rendered her disabled.  In her complaint she claimed that the police officers who arrested her at the airport for disorderly conduct and assault and battery, charges which were later dropped, were "fully aware of her disability because she had vocalized [it] to them," and that she was neither "drunk" nor "disorderly," and that her "mental faculties were completely intact."  *Id.* at 52-53.  The court found that "because the plaintiff does not connect her arrest to any symptoms of PTSD, she does not allege sufficient facts to support a finding of ADA liability under the first theory of wrongful arrest."  *Id* at 53.

Notably, the court went on to find that Montae also failed to state a claim under the second theory.  The court held that "Even if the officers were aware that she self-identified as being disabled, that knowledge must have been coupled with a failure on their part to accommodate her disability.  The plaintiff alleges that the MSP officers' actions caused her to suffer "fear and trauma" but she makes no claim that she was injured to any greater extent than a non-disabled arrestee would have been."  *Id.*

We find the *Montae* case to be instructive.  First, similar to Montae, Sheffler does not allege an ADA or RA violation on the ground that he was arrested based upon a misperception of the effect of his disability as criminal activity.  According to the Amended Complaint, Sheffler did not begin to experience the self-described[2] panic attack until at some point after his arrest and placement in the back of the police vehicle.  (DN 35, ¶83).

---

[2] We have termed this "self-described," as nowhere does Sheffler allege that anyone but himself characterized his symptoms as a "panic attack."  In fact, Sheffler alleges that after being assessed on the scene  by an EMT, Michael Carroll, the EMT determined that he was not having a panic attack and informed Lee and the other EMT of this opinion.  Sheffler alleges that he has been adjudicated by the Social Security Administration as disabled due to

With respect to the second theory of ADA/RA liability in an arrest context, Sheffler fails to allege that, with knowledge of his disability, the police and/or EMTs failed to accommodate his disability.

Sheffler alleges that while under arrest and in the police vehicle, "Plaintiff informed Lee that he suffered from a panic disorder and that he needed his medication back. Lee refused." This allegation states nothing more than that Sheffler self-reported that he suffered from a panic disorder.   The allegation does not suggest that he was experiencing manifestations of the disability at that time, that he requested any service, or that he was denied any service.   Sheffler has cited no authority, and we have found none, that a demand for the return of medication while under arrest constitutes the discriminatory denial of a "service, program, or activity" contemplated by the ADA or RA.   Such a contention defies common sense, especially in light of the fact that there is no allegation that he was suffering manifestations of the disability at the time.

Sheffler alleges that "At 01:27 am, after continued interrogation by Lee, Plaintiff was going through a full blown panic attack and *pleaded* to be brought to the hospital at which point Lee said he would be going to the hospital." (DN 35, ¶ 83).  In this paragraph, Sheffler does allege that he was experiencing manifestations of his disability --  a "panic attack" – and that he requested a service -- to be transported to the hospital.  Lee told him that he would be transported to the hospital, and he was, in fact, transported to the hospital by ambulance.  Sheffler alleges that he next informed Lee that he "was having symptoms related to a heart attack," (DN 35, ¶ 84), and that "[a]t 1:28:54 a.m., in a lackadaisical manner, Lee finally informed dispatch that

"agoraphobia with panic disorder."  We take this statement as true for purposes of this motion.  However, Sheffler must allege that he suffered manifestations of this disability at the relevant time and for which he sought accommodation.

Plaintiff was complaining of panic vs. heart attack." (DN 35, ¶ 85).[3]   Sheffler's allegations indicate that one minute and fifty-four seconds after being informed that Lee was experiencing a "panic attack" Lee called for medical services for Sheffler.[4]

Sheffler further faults Lee for declining his pleas to transport him in the police cruiser to the hospital. (DN 35, ¶¶ 86, 87). Sheffler has offered no authority establishing an entitlement to an accommodation of his choice. Sheffler indicated to Lee that he was suffering from manifestations of a disability, and requested medical treatment. He asked to be transported to the hospital, and Lee assured him that he would be going to the hospital. Lee called for EMTs and an ambulance. The EMTs arrived, assessed Sheffler, and transported him to the hospital.[5] Thus Sheffler has not alleged a failure to accommodate his disability.

Sheffler focuses on what he terms "delay" in transporting him to the hospital. We will assume for the sake of argument that he is entitled to be taken to a hospital based upon the fact that he requested it. As noted earlier, Sheffler has not cited any authority suggesting that he is entitled to the accommodation of his choice. Further, "Questioning the necessity and reasonability of a requested disability accommodation does not, by itself, create the inference of intentional discrimination. To hold otherwise would be to require public entities to grant any requested accommodation and never revisit an accommodation once granted lest they subject themselves to liability for intentional discrimination simply by questioning the reasonableness or necessity of the request." *Anderson*, 798 F.3d at 359.

---

[3] Sheffler's ADA and RA claims do not allege a "heart attack" or any heart-related condition as a "known disability." Rather, his claims are limited to "agoraphobia with panic disorder." DN 35, ¶¶ 290, 294). Sheffler does not allege that he indeed suffered a heart attack. We need not address the "heart attack" allegations further.

[4] Whether Lee's manner was "lackadaisical" is of no moment. Colorful verbiage does not a claim make. The question at hand is whether services were rendered to accommodate Sheffler's self-reported disability. By his own indications, they were.

[5] Paragraph 88 states that "Lee intentionally stopped his vehicle in motion which resulted in intentional and extreme emotional and physical distress to Plaintiff." (DN 35, ¶ 88). There is no allegation in the Amended Complaint that Sheffler was ever in a moving police vehicle after his arrest. This is a random and unintelligible allegation. In any event, it has no bearing on the claim of failure to accommodate Sheffler's disability.

Lee's allegations of "delay" consist of (1) the time it took Lee to call for emergency medical service for Sheffler, and Lee's refusal to transport Sheffler to the hospital in the police cruiser (DN 35, ¶¶ 83-87), and (2) the time it took emergency medical services to evaluate and transport Sheffler to the hospital.  (DN 35, ¶ 116).

With respect to the allegations concerning Lee's "delay" in calling for emergency personnel, the Amended Complaint is devoid of allegations that this "delay" bore any relation to Sheffler's disability.  In fact, Sheffler's contention is that he was arrested and placed in the vehicle for having asserted his right to refuse to provide identification to Lee.  Sheffler alleges that once placed in the police cruiser, Lee turned on the in-car camera and proceeded to bolster the purported basis for the arrest by recording an untruthful narrative of the events.  Thus Sheffler alleges that he was placed in the vehicle and interrogated as a result of being wrongfully arrested for refusing to cooperate. Lee continued in his attempt to elicit identifying information from Sheffler.  Sheffler's rendition of the events indicates that once he informed Lee that he was suffering symptoms of a "panic attack," Lee stated that Sheffler would be going to the hospital, and called for emergency medical service approximately two minutes later.

After Sheffler was evaluated by EMT Carroll, Lee was told by Carroll that Sheffler was "not having a panic attack."  (DN 35, ¶ 97).  Lee also stated to Carroll that Sheffler had been "Belligerent and Combative" with him.  (DN 35, ¶ 96).  With respect to the allegations concerning "delay" by the EMTs in transporting him to the hospital, Carroll determined, whether correctly or incorrectly, that Sheffler was *not* having a panic attack.  Thus, according to Sheffler's allegations, any delay in transporting Sheffler to the hospital was not a knowing failure to accommodate his disability.  Rather, his symptoms were attributed to hyperventilating which Carroll attempted to help Sheffler control.  Sheffler's allegations in the Amended

Complaint are consistent, in that, after talking with Lee, the EMTs attempted to gain the identifying information from Sheffler that Lee had not been successful in obtaining before transporting him to the hospital.  EMT Albertson allegedly stated to Sheffler that "The hospital won't even take you unless you tell them your information;" "Unless you cooperate and give us the information we need, we can't get you out of the car;" and "The quicker you answer the questions, the quicker you leave to the hospital."  (DN 35, ¶¶ 100, 101).  Per these allegations, delay, if any, is attributable to the EMTs' efforts to garner Sheffler's cooperation, and not in any way connected to Sheffler's purported disability, as he was not perceived to be suffering from a panic attack.  Additional allegations make this contention even more plain.  Carroll is alleged to have "refused to give Plaintiff his medication, *in a manner to suggest* retaliation for Plaintiff being *"uncooperative.*"  (DN 35, ¶ 108 (emphasis in original)).

In the case of *Everson v. Leis*, 412 Fed.Appx. 771 (6th Cir. 2011), a police officer responded to an incident at a mall in which an individual was suffering from epileptic seizures. When the officer arrived at the scene, he asked an EMS paramedic whether the individual's behavior was part of his medical condition to which the paramedic responded, "[n]o, he's just acting like a f___ing a__hole." *Id.* at 775.  In evaluating the claim that the officer intentionally discriminated against the plaintiff, the court found that there was "insufficient evidence to support a conclusion that [the officer] knew that [this individual]'s conduct was caused by his disability or that [the officer] acted because of—rather than in spite of—[the individual]'s disability."  The officer knew only that the individual had recently suffered a seizure, and the court found significant that the officer had been told by an EMS professional that the individual's conduct was not related to a seizure. *Id.* at 778.

To be clear, the *Everson* case was decided on summary judgment rather than on a motion for judgment on the pleadings. However, the court is tasked here with determining whether the claims "contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Commercial Money Center, Inc. v. Illinois Union Insurance Company*, 508 F.3d 327 (6th Cir. 2007). The allegations, taken as true herein, not only fail to allege facts which support a viable claim for intentional discrimination under the ADA or RA, but, in fact, work against such an assertion. Similarly to *Everson*, an EMS professional stated to the arresting officer that the arrestee was not evidencing symptoms of a disability and all proceeded accordingly. Whether this was an accurate or inaccurate assessment by the EMT is immaterial. The fact of the assessment and communication of the resulting opinion are the pertinent matters for purposes of the ADA and RA claims.

In the 6th Circuit case of *Jones v. Lacey*, 108 F.Supp.3d 573, 591 (6th Cir. 2015), the officer's decision to ticket an HIV-positive driver, stopped initially for a malfunctioning brake light, was found to be based upon her HIV status because the officer's own testimony offered a connection between his issuance of the ticket and HIV status. The officer had searched the vehicle and the driver's purse without donning any protective gear such as gloves before the driver revealed that she was HIV positive. When she revealed her HIV status, the officer became agitated and stated that "Honestly, *if it wasn't for that*, I don't think I would have wrote anybody for anything, but that kind of really aggravated me, you know what I mean…" *Id.,* (emphasis in original).

In concluding that Jones made out a *prima facie* case of discrimination, the Court of Appeals distinguished the case of *Dillery v. Sandusky*, 398 F.3d 562 (6th Cir. 2005) the facts did not support an ADA claim. Dillery, a wheelchair bound individual, often chose to travel in her

15

wheelchair in the Sandusky streets, as many of the sidewalks were uneven.  She was cited on three occasions for this roadway travel, as motorists complained to the police that they had to swerve to avoid hitting her.  Dillery alleged that the officers discriminated against her under the ADA by ticketing her for traveling in the street.  The court rejected the claim, as the record reflected that the police did not stop her because of her disability, but rather were investigating citizen complaints and acting to keep the roadways and Dillery safe.  *Id.*

Although *Jones* and *Dillery* were decided on summary judgment, we cite these cases to illustrate that courts which recognized a *prima* facie case of discrimination under the ADA or RA were able to identify specific facts which supported a connection between the disability and the police conduct.  We do not have allegations of fact in this complaint that would permit the court to reasonably infer such a connection in Sheffler's case.  We reiterate that the court "need not accept as true legal conclusions or unwarranted factual inferences," *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999).

Thus, all allegations in the Amended Complaint being taken as true, Sheffler alleges that his treatment at the hands of Lee and Carroll was a result of his refusal to cooperate with Lee's demands for identifying information.  The facts do not suggest that he was subjected to disability discrimination.  In *Twombly*, 127 S.Ct. at 1971, the United States Supreme Court noted that it found a "few stray statements" in the complaint that appeared to speak directly to a necessary element of the plaintiff's claim but, upon closer analysis and under a "fair reading," were "merely legal conclusions resting on the prior allegations."   127 S.Ct. 1970.   The court concluded, "We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy."   127 S.Ct. at 1971.   We find the turn of phrase "invests the action or inaction alleged with a plausible suggestion…" to invoke an apt

comparison here. With respect to the ADA and RA claims, we conclude that, taking all of the allegations as true, nothing in the Amended Complaint invests the alleged actions and inactions of Lee and Carroll with a plausible suggestion of intentional discrimination because of Sheffler's disability.

The Amended Complaint thus fails to sufficiently allege a factual foundation to support an ADA or RA discrimination claim.  Counts VII and VIII will therefore be dismissed.

For the reasons set forth herein, Counts I, II, and III will be dismissed as to Metro and Counts VII, VIII, and IX will be dismissed, all by separate order entered this date.

**IT IS SO ORDERED.**

March 7, 2016

**Charles R. Simpson III, Senior Judge**
**United States District Court**